**BUCKINGHAM TOWNSHIP,**

v.

**Hon. Ken WYKLE, Administrator, Federal Highway Administration, David Lawton, Chief of Planning, Region 3, Federal Highway Administration, and Bradley L. Mallory, Secretary for the Department of Transportation, Commonwealth of Pennsylvania.**

No. CIV. A. 99–621.

United States District Court,
E.D. Pennsylvania.

June 22, 2001.

Robert J. Sugarman, Daniel R. Vice, Sugarman & Associates, Philadelphia, PA, for plaintiff.

James G. Sheehan, Annetta Foster Givhan, U.S. Attorney's Office, Philadelphia, PA, Brett Gainer, U.S. Dept. Trans., Baltimore, MD, for defendants.

Albert J. Cepparulo, New Hope, PA, Thomas Alan Linzey, Community Environmental Legal Defense Fund, Shippensburg, PA, Thomas J. Profy, III, Begley, Carlin & Mandio, Langhorne, PA, for movants.

Annetta Foster Givhan, United States Attorneys Office, Philadelphia, PA, John M. Hrubovcak, Pennsylvania Dept. of Transportation, Office of Chief Counsel, Harrisburg, PA, for intervenor-defendant.

### MEMORANDUM

WALDMAN, District Judge.

### I. *Introduction*

This case arises out of the proposed improvement of U.S. Route 202, Section 700 ("Section 700") and development of an interchange at Route 202 and State Route 313. Plaintiff is concerned that peaceful and scenic Buckingham Township in Bucks County will be spoiled if defendants are allowed to proceed as planned.

As a federal aid project, the Section 700 project is subject to various federal statutory requirements. In a 97 page amended complaint, plaintiff alleges that defendants used falsified data and violated virtually every applicable statutory requirement in planning and proceeding with the highway project. Plaintiff specifically claims that defendants violated requirements imposed by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.;* the Federal–Aid Highway Act ("FAHA"), 23 U.S.C. §§ 109(a)(2) & (h), 134, 135; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* the Clean Air Act ("CAA"), 42 U.S.C. §§ 7506; and, the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f & 470h–2(f).[1]

Plaintiff also asserts state law claims under statutes governing the duties of PennDOT, 71 P.S. § 512(a)(7) & (b)(23), requiring PennDOT to assist local officials, 36 P.S. §§ 670–901, and adopting an interstate compact on regional transportation, 73 P.S. § 701.[2]

---

1. The alleged violation of each discrete requirement of each pertinent statute is pled as a claim, resulting in a 14 count complaint.

2. 71 P.S. § 512(a)(7) requires PennDOT to cooperate with other appropriate agencies, political subdivisions and interested private parties in coordinating plans and policies for the development of air, ground and water commerce. Section (b)(23) directs the Department to consider the operation and use of existing transportation routes and programs

Presently before the court are defendants' motion for summary judgment and plaintiff's motion for summary judgment. The administrative record is voluminous and quite technical in nature. It consists of thousands of documents which consume twenty-one boxes. The parties have also presented substantial submissions. Additionally, briefs were filed on behalf of seventeen amici.[3]

## II. *Standard of Review*

■ Summary judgment generally is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Under the APA, the court bases its decision on a review of the administrative record. *See* 5 U.S.C. § 706; *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). There are thus generally no genuine issues of material fact in an APA case. *See Clairton Sportsmen's Club v. Pennsylvania Turnpike Comm'n,* 882 F.Supp. 455, 463 (W.D.Pa.1995).

As a practical matter, "when a plaintiff who has no right to a trial de novo brings an action to review an administrative record which is before the reviewing court, the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involve matters of law." *Bank of Commerce of Laredo v. City Nat'l Bank*

*of Laredo,* 484 F.2d 284, 289 (5th Cir.1973); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 432 F.2d 1307, 1310 (6th Cir.1970) (cases challenging administrative action ripe for summary judgment), *rev'd on other grounds,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *See also Lukens Steel Co. v. Kreps,* 477 F.Supp. 444, 446 n. 3 (E.D.Pa.1979) (denial of summary judgment in administrative action generally means opposing party is entitled to judgment based on the record or a remand to the agency is required because its action is not supported by the record under applicable standards of review and further proceedings are necessary.)

## III. *Historical and Factual Background*

Section 700 of U.S. Route 202 extends from just south of Pennsylvania State Route 63 in Montgomery Township, Montgomery County, to the Pennsylvania State Route 611 Bypass in Doylestown Township, Bucks County. This section of highway is approximately nine miles in length and covers 9,100 acres. It crosses two counties and eight municipalities.[4]

In response to requests from local and county planners, the Delaware Valley Regional Planning Commission ("DVRPC") recommended in a November 1989 report that studies be commenced to address mobility deficiencies and projected growth with respect to Section 700.[5] In the No-

---

during construction and following completion of new routes or programs. 36 P.S. § 670–901 directs PennDOT to assist local officials with standards, methods and information related to the construction, alteration, repair and maintenance of highways and bridges. The interstate compact creates a mechanism to coordinate regional transportation planning among several counties in southeastern Pennsylvania and southern New Jersey.

**3.** Eleven amici, including two area municipalities, oppose the project. Six amici, all area municipalities, support the project.

**4.** The counties are Bucks and Montgomery. The municipalities are Upper Gwynedd Township, Lower Gwynedd Township, Montgomery Township, New Britain Borough, New Britain Township, Chalfont Borough, Doylestown Township and Warrington Township.

**5.** The DVRPC is the designated metropolitan planning organization for the Philadelphia re-

vember 1989 report, the DVRPC concluded that the "new alignment corridor" which had been recommended in a 1968 PennDOT study regarding this section of highway was still viable through lands mostly reserved for the highway by local township actions.[6]

In 1990, PennDOT initiated more detailed environmental and preliminary engineering studies for Section 700. PennDOT advertised and held four public meetings between February 7, 1991 and December 13, 1994 concerning studies of improvements to Section 700, prior to initiating the formal environmental process.

Pursuant to NEPA and its attendant FHWA regulations, the Federal Highway Administration ("FHWA"), as lead agency, approved a draft Environmental Impact Statement ("DEIS") for circulation on July 10, 1996.[7] The DEIS was circulated to the public, and its availability was published in the Federal Register on August 9, 1996. *See* 61 Fed.Reg. 41607–41608.

On September 12, 1996, PennDOT held an open hearing at which members of the public were provided an opportunity to comment on the DEIS. Plaintiff's representatives were among the numerous participants. PennDOT also held a meeting directly with members of plaintiff's Board of Supervisors on September 19, 1996.

After seeking and receiving an extension of time to submit comments, plaintiff submitted extensive comments on the DEIS on October 11, 1996. In response to plaintiff's comments, additional traffic analysis was completed to verify the accuracy of the prior analysis.

The final report of the additional traffic analysis was documented in Supplement No. 4 which was finalized in October 1997 and to which the final Environmental Impact Statement ("FEIS") expressly referred. This was available for public review and comment. Supplement No. 4 was provided to plaintiff on October 10, 1997.[8]

Plaintiff learned during this period that PennDOT was also making plans to develop a highway interchange at Pools Corner in Buckingham Township. PennDOT represents that this is independent from the Section 700 project. Plaintiff suggests that it is a remedial measure to cope with traffic which the Section 700 improvements would discharge into Buckingham Township.

On October 8, 1997, PennDOT approved the FEIS for circulation. On October 16, 1997, David Lawton, the FHWA Region 3 Director of Planning and Program Development, approved the FEIS for circulation. Hundreds of copies of the FEIS were mailed to commentators, including plaintiff. On November 14, 1997, notice of availability of the FEIS was published in

gion and has both state and local government representation, including representatives from Montgomery and Bucks Counties. The DVRPC was originally named as a defendant and then dismissed by order of March 31, 2000.

6. The "new alignment corridor" represents one option for improvement of Section 700. Plaintiff suggests that the improvement of Section 700 is not "local" in nature but rather an attempt by defendants, PennDOT, NJDOT and the DVRPC to transform Route 202 into a multi-lane regional superhighway to provide for commerce and growth between New Jersey's major interstate highways and Interstate–76 at Valley Forge.

7. "Lead Agency means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement." 40 C.F.R. § 1508.16.

8. A draft of Supplement No. 4 was prepared in February 1997. It is virtually identical to the final document. It was provided to plaintiff in August 1997.

the Federal Register. *See* 62 Fed.Reg. 61111–61112. By letter of January 29, 1998 to the FHWA Division Administrator, the Regional Deputy Director of the Office of Environmental Programs advised that "EPA believes that the highway construction and operation should not provide additional insult to the environment" and stated that "[w]e applaud PADOT and FHWA for [their] efforts" to protect the environment.

On August 27, 1998, the FHWA Division Administrator issued a Record of Decision ("ROD") formally approving the project. The FHWA filed the Administrative Record ("the Record") for the Section 700 project and the project at Pools Corner which the FHWA had also approved following environmental review.

Following initiation of this action, the court on November 19, 1999 ordered defendants to make the Record whole by "filing and providing to plaintiff all documentation, correspondence, set-ups, assumptions, formulae, co-efficients and other data concerning U.S. 202 Traffic Analysis for Section 700 Supplement No. 4 and DVRPC Responses to Buckingham Comments 1–4 (April 1998), all communications between the Pennsylvania Department of Transportation and the Federal Highway Administration and within the FHWA regarding the relationship between the Pool's Corner project and Section 700, and any version of Supplement No. 4 dated December 1996 which may exist." On December 17, 1999, defendants supplemented the Record pursuant to that order.

Pointing to statements of two DVRPC employees that certain set-ups and assumptions had been discarded by the DVRPC, plaintiff suggested that the Record was still incomplete. Defendants responded that some of the set-ups and assumptions from the traffic model used to conduct the analysis in Supplement No. 4 were not available as they existed at the time simply because the traffic model is a computer program which is constantly revised in the ordinary course of business to accommodate updated forecasting methodology, computer technology, population changes and traffic-related data.

Defendants have persistently averred that the Record as supplemented is the complete record before the FHWA at the time it filed the ROD. W. Thomas Walker of DVRPC pinpointed the data and documents sought by plaintiff in the Record.[9]

The court ordered defendants to produce to plaintiff the documentation, correspondence, set-ups, assumptions, formulae, co-efficients and other data supporting Supplement No. 4 in a computer diskette format prepared for use with the TRANPLAN program; to produce to plaintiff a copy of the TRANPLAN program and any instructions necessary for running the program; and, to file sworn affidavits from persons with direct knowledge verifying that defendants have filed in the administrative record and produced to plaintiff all documents, data and other pertinent information on which the FHWA relied in creating the ROD or which served as the basis for any information on which the FHWA so relied, and detailing the nature of any assumptions, set-ups or related data which had been irretrievably discarded or lost and the reasons therefor. Defendants complied with that order.

## IV. *Discussion*

As noted, the administrative record is voluminous and quite technical, and the

9. Dr. Walker explained how Supplement No. 4 could be replicated by a competent analyst using the TRANPLAN program in conjunction with the "Network," the "prototype Setups" and the trip tables which were included in the December 17, 1999 filing.

submissions of the parties are substantial. While this has necessitated an exhaustive review, encumbered further by the court's prior lack of familiarity with some of the technical methodology and terminology, the court will confine itself herein to a summary of the respective positions and corresponding evidence in the Record. To discuss in detail each item in the Record or each assertion, insinuation and argument in this highly contentious litigation would be forbidding and require the razing of a small forest to supply the paper needed for such a product.

### A. Cognizable Claims

Many of the discrete claims asserted by plaintiff are not cognizable.

■ The provision of the FAHA relied upon by plaintiff, 23 U.S.C. § 109(a)(2), particularly when read in the context of the surrounding language, constitutes nothing more than a general statement of policy which does not imply a private right of action. *See Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 186 (4th Cir.1999). The FAHA amendments in the Intermodal Surface Transportation Efficiency Act ("ISTEA") also do not authorize a private right of action. *See Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Committee,* 840 F.2d 258, 265–67 (5th Cir.1988); *Sierra Club v. Pena,* 915 F.Supp. 1381, 1390–91 (N.D.Ohio 1996), *aff'd sub nom., Sierra Club v. Slater,* 120 F.3d 623 (6th Cir.1997).

■ There is no private right of action under the citizen suit provision of the Clean Air Act for the violation of the Act alleged by plaintiff. *See* 42 U.S.C. § 7506(c); *Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250, 1260 (1st Cir.1996); *American Auto. Mfrs. Ass'n v. Cahill,* 53 F.Supp.2d 174, 186 (N.D.N.Y.1999); *City of Yakima v. Surface Transp. Bd.,* 46 F.Supp.2d 1092, 1099 (E.D.Wash.1999).

■ There is similarly no private right of action under NEPA. *See Noe v. Metropolitan Atlanta Rapid Transit Auth.,* 644 F.2d 434, 436–39 (5th Cir.1981) ("[T]o the extent the legislative history indicates any Congressional attitude, it indicates a desire not to provide a remedy for private individuals who may be injured by a violation of NEPA"), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981); *Jersey Heights Neighborhood Ass'n,* 174 F.3d at 186 (no private right of action for failure to prepare proper EIS); *Public Citizen v. United States Trade Rep.,* 5 F.3d 549, 551 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994) (same); *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988) (no private right of action for failure to prepare supplemental EIS); *Utah v. Babbitt,* 137 F.3d 1193, 1203 (10th Cir.1998) (NEPA does not provide private right of action and any claim for failure to prepare proper EIS must be maintained under APA); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1353 n. 13 (9th Cir.1994) (NEPA does not provide private right of action to challenge sufficiency of EIS); *Public Citizen v. Office of U.S. Trade Reps.,* 970 F.2d 916, 918 (D.C.Cir.1992) (same); *Knowles v. United States Coast Guard,* 924 F.Supp. 593, 599 (S.D.N.Y.1996) (reclassifying NEPA claim for failure to prepare EIS as claim under APA); *Westlands Water Dist. v. United States Dep't of Interior,* 850 F.Supp. 1388, 1411 (E.D.Cal.1994) (same).

Insofar as defendants may have violated the standards established by the FAHA, ISTEA, CAA or NEPA, however, such conduct could be characterized as arbitrary, capricious or an abuse of discretion. The court will thus assess those actions in considering the APA claim.

As plaintiff may obtain relief against defendants Wykle and Lawton, plaintiff's APA claim against defendant Mallory clearly is not a claim "for which there is no other adequate remedy." *See* 5 U.S.C. § 704; *New York City Employees' Retirement Sys. v. SEC,* 45 F.3d 7, 14 (2d Cir.1995); *Washington Legal Found. v. Alexander,* 984 F.2d 483, 486 (D.C.Cir. 1993); *Gillis v. United States Dep't of Health & Human Svcs.,* 759 F.2d 565, 575 (6th Cir.1985). Judgment for defendant Mallory is thus appropriate on that claim.

In this circuit at least, a private right of action under NHPA has been recognized. *See Boarhead Corp. v. Erickson,* 923 F.2d 1011, 1017 (3d Cir.1991). The court will thus separately consider plaintiff's NHPA claim.

There is no private right of action conferred by the interstate compact and there has in any event been no showing that any signatory has violated the compact. The federal defendants, of course, are not constrained by duties imposed by state law on a state agency. The court has no authority to review the compliance of state officials with state law and accordingly dismissed by prior order the state law claims against defendant Mallory. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 120–12, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Randolph v. Rodgers,* 170 F.3d 850, 859 (8th Cir.1999); *Blake v. Papadakos,* 953 F.2d 68, 73 n. 5 (3d Cir. 1992); *Fitzpatrick v. Pennsylvania Dep't. Of Transp.,* 40 F.Supp.2d 631, 635 (E.D.Pa. 1999). In any event, it is clear that Penn-DOT did not disregard any duty imposed by 71 P.S. §§ 512(a)(7) and (b)(23) or 36 P.S. §§ 670–901.

B. Administrative Procedures Act Claim

Under the APA, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency's decision "is entitled to a presumption of regularity." *Overton Park,* 401 U.S. at 415, 91 S.Ct. 814. "[T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. 814. While the "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Id.*

The court's review is limited to the whole administrative record before the relevant agency at the time of its decision. *See* 5 U.S.C. § 706; *Overton Park, Inc.,* 401 U.S. at 420, 91 S.Ct. 814; *Higgins v. Kelley,* 574 F.2d 789, 792–94 (3d Cir.1978); *Twiggs v. U.S. Small Bus. Admin.,* 541 F.2d 150, 152–53 (3d Cir.1976). However, "[a] document need not literally pass before the eyes of the final agency decisionmaker to be considered part of the administrative record." *Clairton Sportsmen's Club,* 882 F.Supp. at 465. Pertinent information upon which administrative decisionmakers may have relied may be considered although not included in the record as filed. *See Higgins,* 574 F.2d at 792–93.

The ultimate question is whether the Record supports the FHWA's decision and not whether a different decision would have been better or might have been made with more information. The court is not empowered to determine the wisdom of relieving traffic congestion in one geographic area by shifting some of the burden into another. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (reviewing "court is not empowered to substitute its judgment for that of the agency"). *See also C.K. v. New Jersey Dep't of Health & Human Servs.,* 92 F.3d 171, 182 (3d Cir. 1996). That is a decision legally left to the expertise of the FHWA.

■ The APA so limits the role of the court because Congress has determined that "the elements that make up such decisionmaking are so diverse that they are consigned to officials and agencies with specialized knowledge, experience, resources, and mechanisms for broad public participation that a court does not possess [and the courts] are not free to weigh the many competing interests underlying these issues." *Calio v. Pennsylvania Dep't of Transp.*, 101 F.Supp.2d 325, 328–29 (E.D.Pa.2000). However, "[i]f the record before the agency does not support the agency action, or if the agency has not considered all the relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, a court should remand to the agency for additional investigation or explanation." *Society Hill Towers Owners' Ass'n v. Rendell*, 20 F.Supp.2d 855, 862 (E.D.Pa.1998).

■ The Record consists of numerous interagency communications and reports based on studies conducted by the FHWA and PennDOT. This includes a Draft Environmental Impact Statement/Section 4(f) Evaluation ("DEIS"); a Final Environmental Impact Statement/Section 4(f) Evaluation ("FEIS"); Historic Structures Inventory and Determination of Eligibility Reports; Criteria of Effect Reports; a wetlands report; noise reports; Congestion Managements Strategies and Major Investment Study; a Memorandum of agreement between FHWA and the Pennsylvania State Historic Preservation Office; and, documents related to studies regarding the Pools Corner project.[10]

### 1. FAHA and ISTEA

■ In Counts I, II, V and XII of its Amended Complaint, plaintiff alleges that defendants failed to comply with planning regulations and with the requirements for the Transportation Plan and Program, the Congestion Management Analysis ("CMS") and the major investment study ("MIS").

The FAHA, the ISTEA, and FHWA and Federal Transit Administration ("FTA")

---

10. The parties have also submitted affidavits or declarations of experts. Some are accompanied only by a photocopied or facsimile signature and a submission of plaintiff's retained expert Dr. Tomazinis is replete with handwritten edits which appear to be made by the same individual who scribbled handwritten edits in the body of plaintiff's "supplementation." As no party has objected to the form of any affidavit, the court will not reject any on that ground. *See United States for Use and Benefit of Austin v. Western Elec. Co.*, 337 F.2d 568, 574–75 (9th Cir.1964). Additional substantive submissions, including expert opinions and suppositions or inquiries about the mental processes of the decisionmakers, however, are not cognizable absent "a strong showing of bad faith or other improper behavior" on the part of the agency. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Society Hill Towers Owners' Ass'n*, 20 F.Supp.2d at 863. There has been no such showing. A party may not undermine an agency decision even with an affidavit of unquestioned

integrity from an expert expressing disagreement with the views of other qualified experts relied on by the agency, and a court may not weigh the contrary views of such experts to assess which may be more persuasive. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Price R. Neighborhood Ass'n. v. U.S. Dept. of Transp.*, 113 F.3d 1505, 1511 (9th Cir.1997). An agency is entitled to select any reasonable methodology and to resolve conflicts in expert opinion and studies in its best reasoned judgment based on the evidence before it. *See Hughes River Watershed v. Johnson*, 165 F.3d 283, 289–90 (4th Cir.1999); *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 496 (9th Cir.1987). As a practical matter, were it otherwise, virtually every agency action involving expertise or technical analyses could be obstructed by a party who engaged an expert willing to disagree with the views or conclusions of the experts utilized by the agency.

regulations require that federal transportation agencies (the FHWA and the FTA), the MPO (the DVRPC) and state transportation agencies comply with an intricate program for transportation planning. That program requires long-term planning (20 years), which includes development of a Transportation Plan ("Plan"), and short-term planning (3 years) on both a metropolitan and a state-wide geographic scale, known respectively as a Transportation Improvement Program ("TIP") and a State Transportation Improvement Program ("STIP"). *See* 23 U.S.C. §§ 134, 135.

Because the region at issue here—the Philadelphia metropolitan area—contains a population greater than 200,000 persons, the area must both include a Metropolitan Planning organization ("MPO")—the DVRPC—and be designated as a Transportation Management Area ("TMA"). Designation as a TMA means that a CMS must be prepared. Where, as here, the TMA is in a nonattainment area for ozone or carbon monoxide, the CMS must include consideration of reasonably available strategies to reduce travel demand prior to adding single occupant vehicle ("SOV") capacity to the transportation network. *See* 23 C.F.R. §§ 450.336(b)(1) & (2), 500.109(d)(1) & (2).

Because Section 700 is a highway improvement of substantial cost which is expected to have a significant effect on factors such as capacity, traffic flow and level of service, and which was initiated but not completed when the MIS regulations were issued on October 28, 1993, a MIS is necessary and both the FHWA and the FTA must be consulted to determine the precise MIS requirements to be applied to the project. *See* 23 C.F.R. §§ 450.104, 450.318.

Defendants complied with these requirements by establishing for the relevant periods and the Section 700 project the necessary TIP, STIP, Plan, CMS and MIS. In accordance with the statutory and regulatory provisions, defendants and/or DVRPC considered as part of the Plan, the TIP and the STIP various factors defining the scope of the planning process;[11] developed a public involvement process as part of the Plan and the TIP which included publication of planning goals and various studies on population, employment growth, commuting patterns, workforce distribution and housing forecasts, *see* 23 U.S.C. § 134(g)(4), (h)(1)(B); investigated various strategies to reduce travel demand including traffic flow improvements, carpooling, non-motorized programs, flexible

---

11. The statewide and metropolitan transportation planning processes must provide for consideration of projects and strategies that will—

increase the safety and security of the transportation system for motorized and nonmotorized users; increase the accessibility and mobility options available to people and for freight; protect and enhance the environment, promote energy conservation, and improve quality of life; enhance the integration and connectivity of the transportation system, across and between modes, for people and freight; promote efficient system management and operation; and emphasize the preservation of the existing transportation system.

23 U.S.C. §§ 134(f)(1), 135(c)(1). In addition, the metropolitan planning process must provide for consideration of projects that will "support the economic vitality of the metropolitan area, especially by enabling global competitiveness, productivity, and efficiency," while the statewide planning process must provide for consideration of projects that will "support the economic vitality of the United States, the States, and metropolitan areas, especially by enabling global competitiveness, productivity, and efficiency." *See* 23 U.S.C. §§ 134(f)(1)(A), 135(c)(1)(A).

In any event, a failure of the responsible agencies to consider any of these factors is not reviewable by the court. *See* 23 U.S.C. §§ 134(f)(2), 135(c)(2).

work hours and parking pricing controls; and, included Section 700 in the Plan, the TIP and the STIP.

As required by the CMS regulations, defendants and the DVRPC analyzed 36 travel demand reduction and operational management strategies; analyzed all 15 such strategies deemed reasonably available; determined that no one or combination of the CMS strategies would address the needs and purpose of Route 202; and, summarized the results in the DEIS and the FEIS.[12] The CMS identified an implementation schedule, the agencies responsible for the project and the funding sources as required.

Consistent with the MIS regulations, the DVRPC consulted the FHWA and the FTA and performed a MIS in conjunction with the other environmental analyses in the project study. The MIS included a definition of the purpose and need of the project, and consideration of numerous alternatives including: no action; congestion management strategies; transportation systems management; widening existing U.S. 202; widening existing U.S. 202 with Chalfont runaround; widening Upper State Road/Shady Retreat Road; relocating U.S. 202 on new alignment; widening Upper State Road with new alignment connector; widening Stump Road with new alignment connectors; a relief corridor northwest of U.S. 202; new alignment southeast of Stump Road; and, mass transit. Following these analyses, the FHWA approved and recommended for detailed study and inclusion in the DEIS three build alternatives—widening Upper State Road/Shady Retreat Road; relocating U.S. 202 on new alignment; and, widening Upper State Road with new alignment con-

nector—as well as the no action alternative.

A MIS/CMS Committee, co-chaired by PennDOT and the DVRPC, was established. Its members included the FHWA, the FTA, the Southeastern Pennsylvania Transportation Agency ("SEPTA"), the Montgomery and Bucks County planning Commissions, the U.S. Army Corps of Engineers, the EPA, the Pennsylvania Department of Environmental Protection and various affected townships. The MIS reviewed the public involvement process— four public meetings, six project newsletters and more than 100 meetings with agencies and public officials—and considered 15 additional alternatives which were rejected because their combined impact would be only a 4% reduction in vehicle travel miles. The FHWA and the FTA concurred that the final MIS satisfied the requirements of the MIS regulations.

It appears from the Record that defendants in fact satisfied the MIS requirements and all pertinent requirements of the FAHA and the ISTEA.

2. NEPA

■ In Counts III, IV, VIII, X and XIII of the Amended Complaint, plaintiff claims that defendants violated NEPA by improperly excluding the Pools Corner project from the Section 700 study area; inadequately projecting population; improperly performing traffic analyses; failing to provide plaintiff with an adequate opportunity to comment on the Section 700 project; and, failing to consider alternatives. The court will address plaintiff's allegations and the portions of the Record relevant thereto insofar as they pertain to the evaluation of defendants' actions under the APA.

---

**12.** Defendants nevertheless committed to a carpool/vanpool program and traffic manage-

ment program.

 NEPA "is primarily a procedural statute" which was "designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking," *Morris County Trust for Historic Preservation v. Pierce*, 714 F.2d 271, 274(3d Cir.1983), and to inform the public that a government agency properly considered environmental concerns in its decision making process. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Morris County*, 714 F.2d at 275 (citing *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 142–43, 102 S.Ct. 197, 70 L.Ed.2d 298 (1981)).[13] NEPA requires only that agencies take a "hard look" at environmental consequences before engaging in any major action. *See Society Hill Towers Owners' Ass'n*, 20 F.Supp.2d at 865.

Plaintiff claims that defendants ignored NEPA requirements by segmenting Section 700 and Pools Corner to avoid consideration of the impact of the highway project on plaintiff. It is clear from the Record, however, that defendants' determination of the scope of the Section 700 project and definition of the relevant study area were proper.

In determining whether defendants properly determined the scope of the project and properly defined its study area, the court has considered whether the project has logical termini; whether the Section 700 and Pools Corner projects have independent utility; and, whether the Section 700 project restricts consideration of alternatives for reasonably foreseeable transportation improvements within plaintiff's borders. *See* 23 C.F.R. § 771.111(f)(1)-(3). The court has also considered whether the Section 700 project causes such a significant increase in traffic in Buckingham Township that the decision to approve that project would have been arbitrary, capricious or an abuse of discretion.

The termini are logical. The intersection of Routes 202 and 63 is just south of major commercial malls in a township confronting serious traffic problems. Route 611 is a major crossroad adjacent to Doylestown which is a major regional population center. Section 700 and the Pools Corner project each have independent utility as each satisfies transportation needs or corrects transportation problems without reference to any other transportation project. The Record shows that the Section 700 New Alignment Alternative promotes transportation system linkage and consistency in highway planning; will ameliorate anticipated congestion; improves the likelihood that the roadway will meet future traffic demand, service demands (e.g., fire, police) and community development pressures; and, enhances safety. The Record demonstrates that the Pools Corner project would remedy congestion, address safety concerns and improve the roadway's capacity for handling anticipated growth pressures regardless of whether the Section 700 project is completed.[14] Section 700 does not restrict the consideration of alternatives for reasonably foreseeable transportation improvements within plaintiff's borders.

 The Record supports defendants' contention that their traffic projections

---

13. The United States Army Corps of Engineers, the United States Environmental Protection Agency and the Pennsylvania Department of Environmental Protection are cooperating agencies for the NEPA environmental process. *See* 23 C.F.R. § 771.111(d).

14. Studies show that with no action Pools Corner would totally fail by 2018.

and analyses regarding Section 700 were appropriate. Defendants conducted a series of standard traffic analyses of the project area and of the areas north and south of that area, including Buckingham Township.[15] The FHWA considered the report of a consultant who conducted studies independent of the DVRPC using alternative computer analyses, a standard Highway Capacity Model and CORSIM program. The expert verified that Section 700 would not cause intolerable congestion north of the project area. Plaintiff has shown nothing more about population than a disagreement with projections reasonably derived from Census Bureau estimates utilizing basic demographic data. Defendants analyzed traffic by utilizing standard accepted methods with persons of substantial expertise who have provided sound explanations of what was done and why. It appears that completion of Section 700 may increase somewhat the traffic burden on Buckingham Township. Defendants

may lawfully determine, however, that some of the traffic burden presently suffered within the Section 700 project area should be shifted.

The Record does not show that defendants' decision to pursue the Section 700 project would result in increased congestion in the region or social, economic or environmental impact of such a magnitude as to render the decision arbitrary, capricious or an abuse of discretion.

 The Record also belies plaintiff's claim that defendants failed to provide it with an adequate opportunity for involvement in the Section 700 project, as required by NEPA. The Record supports defendants' response that after preparing the DEIS and before preparing the FEIS, the FHWA requested comments on the DEIS, considered those comments and responded to those comments, as required by the NEPA regulations. *See* 40 C.F.R.

---

15. Plaintiff necessarily attacks the traffic projections. It suggests that defendants used fictional lanes in these analyses. Defendants aver that plaintiff and its expert have misconstrued various planning documents and what they describe as suspicious is nothing more than a coding convention applied in those documents. Plaintiff faults defendants for failing to split zones, however, it appears that this was done only in a particular focused study and zones were split in other areas. Plaintiff complains of "lost trips" which defendants aver represent driveway usage which is never picked up. In any event, these are insubstantial. Plaintiff points to an impedance number of 5.1 to suggest that traffic would be substantial enough to reduce speed at peak times to 5.1 m.p.h. Speed, however, is not an output of the Transplan program. Rather, various numbers which do not reflect true highway speed are inputted to perform an array of theoretical calculations. Plaintiff suggests that defendants did not set up a proper model and used constant proportions rather than allowing the computer to generate variables to improve statistical reliability. Defendants aver that this is simply untrue and that they ran 15 iterations to maximize relia-

bility. Their conclusion was confirmed by additional analyses. Defendants forcefully refute plaintiff's claimed inability to replicate Supplement No. 4. They stress that if the program utilized is properly set up and run with the same numbers by an operator who correctly reads the numbers, the result must be the same. They convincingly point to notations of the expert engaged by plaintiff which suggest he did not understand or miscalculated some of the key numbers. Plaintiff pounces upon the adjustment by defendants' expert of many of the traffic numbers from the computer projections. Buttressed by their expert's detailed affidavit, defendants convincingly and logically explain that a computer program is simply a tool and that it would be irresponsible to disregard other pertinent data in making final projections. Seventeen of twenty-six numbers or nodes were adjusted by 15% or less, within the normal range of error. Moreover, most of these were adjusted upward based, *inter alia*, on actual traffic counts. Other numbers were adjusted upward even more to account for the addition of data reflecting traffic from the Broad Street ramps.

§§ 1503.1, 1503.4. The FHWA also widely publicized, conducted public hearings regarding and requested comments on the FEIS, as required by its regulations. *See* 23 C.F.R. §§ 771.111(h), 771.123(h) & 771.125(g). The FHWA responded to all comments submitted, including those of plaintiff and its expert, Dr. Tomazinis. The FHWA distributed written materials regarding the project to the public and conducted meetings throughout the process with local elected officials, county planning commissions and other regional planning organizations, as well as Buckingham Township supervisors. FHWA officials met personally with representatives of plaintiff in Washington, D.C. at plaintiff's request. It is clear from the Record that defendants complied with the NEPA mandate that the FHWA engage in discourse with the public prior to implementing Section 700.

■ Contrary to plaintiff's assertion, the Section 700 EIS is not deficient for failure to address all reasonable alternatives to the project approved by FHWA. NEPA's implementing regulations require that an EIS "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). *See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("[t]ime and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative"). *Concerned Citizens Alliance, Inc. v. Slater,* 176 F.3d 686, 705 (3d Cir.1999) ("NEPA requires the defendants to consider only 'reasonable' alternatives in the EIS"); *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 524 (9th Cir.1994) ("[t]he range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project").

As noted, as part of the CMS and MIS review processes, defendants considered in detail three build alternatives and a no action alternative. The alternatives deemed unreasonable and thus considered in less detail include: a Transportation Systems Management alternative which involved intersection improvements such as traffic signals and turn lane additions to increase capacity and efficiency, which defendants properly found unreasonable given the projected lack of improvement or even degeneration of traffic congestion under the alternative; the CMS alternatives including regional rail improvements, park and carpool support programs and installation of bicycle racks at rail stations, all of which defendants properly found unreasonable as stand alone alternatives given their 4% reduction in travel demand; and, a Mass Transit alternative which defendants properly found unreasonable given that it would accommodate only 4% of the traffic anticipated in a No Action alternative.[16] It appears from the Record that

---

**16.** Plaintiff suggests that defendants should have considered the abandoned R–2 line as an alternative. Defendants, however, did consider the R–5 line which was the best of the rail options and found it was a bare improvement over no action. Plaintiff also faults defendants for not considering as a reasonable alternative an arterial roadway as proposed by DVRPC in a memorandum of February 3, 1989. As indicated in the memorandum, this early option was recommended largely for reasons of expense. Moreover, except for the grading of intersections, this option is substantially the same as the new alignment with less impact on already heavily congested Chalfont. Also, as discussed in the DEIS and the FEIS, an arterial roadway would not reduce traffic on Route 202 and parallel roads as much as the approved project. Interestingly, even in its early memo-

defendants satisfied the NEPA alternative analysis requirement.

Plaintiff also suggests that defendants should have prepared a supplemental EIS in response to certain information provided to them by plaintiff. The information provided by plaintiff, however, was merely data which defendants considered in Supplement No. 4. The Record shows that defendants reviewed the population data and arguments conveyed by plaintiff, conducted supplemental analyses based on that information and determined that the decision to pursue the Section 700 remained correct. The Record supports defendants' contention that a supplemental EIS is not required.

### 3. Clean Air Act

■ In counts VI and VII, plaintiff claims that defendants failed to satisfy the conformity requirements of the CAA.[17]

The conformity analysis performed by the DVRPC as MPO for the project appears in three TIPs and the Plan which were approved by the FHWA and the FTA. The DVRPC also completed a supplemental analysis which was submitted for public comment and received none. The conformity analysis showed that the TIP and the Plan for the Section 700 project would result in lower emissions of certain ozone precursors. After reviewing the analysis, the EPA concurred with that finding. In a letter confirming its view that the project would not harm the environment, the EPA commended PennDOT and the FHWA for their attention to environmental factors. The DEIS for Section 700 and the Pools Corner project analysis indicated that the carbon monoxide levels would be less than standard and thus acceptable. It appears from the Record that defendants satisfied the pertinent requirements of the CAA.

### C. National Historic Preservation Act Claim

■ Plaintiff's direct claim under the NHPA is based on defendants' alleged failure to assess the effects of Section 700 on historic properties outside the study area, i.e., in Buckingham Township.[18] The Record establishes that, to the contrary, defendants fulfilled their responsibilities under the NHPA as to Section 700 and the Pools Corner project.

■ The NHPA "is primarily a procedural statute, designed to ensure that Federal agencies take into account the effect of Federal or Federally-assisted programs on historic places as part of the planning process for those properties." *Society*

---

dum, DVRPC recommended that any arterial roadway be constructed in a manner which would permit a future upgrade to a freeway north of Bethlehem Pike which includes the Chalfont and Doylestown areas.

17. To the extent that plaintiff raises a challenge to the 1997 conformity rules, defendants are correct that such a claim may not be maintained here. *See* 42 U.S.C. § 7607(b)(1).

18. The statute provides:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking. 16 U.S.C. § 470f.

*Hill Towers Owners' Ass'n,* 20 F.Supp.2d at 863 (quoting *Morris County,* 714 F.2d at 278–79). So long as the effect on the properties is considered, the agency consults the Advisory Council on Historic Preservation ("ACHP") and the agency integrates the ACHP recommendations into the decision making process, the regulations are satisfied. *See* 36 C.F.R. § 60.2 (establishing consultation requirement and noting that "[h]aving complied with this procedural requirement the Federal agency may adopt any course of action it believes is appropriate"); *Concerned Citizens Alliance,* 176 F.3d at 695–96 (noting § 106 is a "stop, look and listen" provision that merely requires an agency to acquire information before acting).

The Record shows that defendants identified historic resources within the Section 700 project area and published those identifications. Defendants then worked with the Pennsylvania Historical and Museum Commission ("PHMC") and the ACHP to determine which properties would be eligible for the National Register. Defendants continued to cooperate with the PHMC until the PHMC concurred with defendants' findings regarding the effects of the project on historic resources and both the PHMC and the ACHP signed a Memorandum of Agreement for the project.

Defendants likewise conducted studies required by the NHPA for the Pools Corner project. Defendants secured an archaeological study of the area and completed a search for nearby historic structures. The PHMC concurred with defendants' determination that the Pools Corner project would have no effect on historic resources.

The steps taken by defendants constitute compliance with the procedural requirements of the NHPA. *See* 16 U.S.C. § 470f; 36 C.F.R. §§ 60.2, 800.4.

## V. Conclusion

Increased development is an inevitable fact of life in expanding suburban areas. It is not unusual for residents who hoped indefinitely to maintain pristine surroundings forebodingly to bemoan such development and, if aroused, to do so tenaciously. At the same time, government is expected to plan for and accommodate population growth, commercial expansion and transportation needs. It is ultimately the responsibility of the officials with appropriate experience and expertise to weigh competing interests and make the often controversial decisions about how this is best achieved, subject to a narrow standard of judicial review. As noted, the "court is not empowered to substitute its judgment for that of the [responsible] agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

Plaintiff's opposition to the project at issue has been rancorous and relentless. Plaintiff accuses defendants of violating virtually every applicable statutory requirement. In a never ending cycle, refutation by defendants is followed by a "supplemental" submission with further accusations. The rhetoric has been acerbic. Tangential documents not included in the formal Record were "suppressed." Rational adjustments reflecting new population projections or other data demonstrate "falsification." Information allegedly "hidden" is in fact contained in the administrative record. A disputed traffic projection is not inaccurate but "fraudulent." Portions of documents are characterized as sinister which when read in context are innocuous.

Plaintiff posits treachery of a type that would require a massive conspiracy among federal and state officials. Plaintiff has not, however, actually demonstrated bad faith or impropriety. When asked why these officials would engage in such nefari-

ous conduct, plaintiff's counsel could only speculate that perhaps they had become "wedded" to the project. There is no explanation, however, of why defendants would wed themselves to a project they knew to be deficient despite superior alternatives.

Even plaintiff acknowledges that some form of project is necessary to address serious traffic issues in the area. Plaintiff conceded at oral argument that upon further study, everyone "may well come back with something similar to what we have" and hypothesizes a Doylestown to New Hope expressway. This may eventuate. Most highway construction, however, is necessarily undertaken in logical phases.

It appears from a review of the administrative record at the time of decision that defendants complied with applicable law and that the decision was based on consideration of the relevant factors. The administrative determinations and decision were in accordance with law and were not arbitrary or capricious. There was no abuse of discretion or clear error of judgment. In these circumstances, the court is constrained to defer.

Accordingly, defendants' motion will be granted. An appropriate order will be entered.

### *ORDER*

**AND NOW**, this day of June, 2001, upon consideration of defendants' Motion for Summary Judgment, plaintiff's Motion for Summary Judgment and the record herein, and following an opportunity for oral argument, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that plaintiff's Motion is **DENIED**, defendants' Motion is **GRANTED** and accordingly **JUDGMENT** is EN-

TERED in the above action for defendants.